[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 521 
Ross Dunn, Jo Ann Paddock, and Jim Folsom, in his capacity as Governor of the State of Alabama and ex-officio president of the board of trustees of Alabama State University ("ASU"), appeal from a judgment declaring, inter alia, that Dunn and Paddock were not entitled to serve as trustees of the ASU. We affirm.
On April 17, 1991, former Governor Guy Hunt submitted to the senate for its confirmation the appointments of Ross Dunn and Jo Ann Paddock to the board of trustees of ASU. The appointments were "read and referred to the [State Senate's] Standing Committee on Confirmations" ("the Committee"). 1991Senate Journal, at 83-85. The Committee voted against the appointments of Dunn and Paddock, and, moreover, declined to "report" the appointments to the full senate for a vote. The senate adjourned without further action on the appointments. On August 13, 1991, the Governor sent letters to Dunn and Paddock, stating that the action of the Committee was "insufficient to oust either of [them]" from the Board and assuring them that they retained their positions as trustees.
On September 12, 1991, the Board sued Dunn, Paddock, and Governor Hunt[1] in his capacity as Governor of the State of Alabama and ex-officio president of the Board (collectively designated as the "defendants"), seeking a declaration that Dunn and Paddock were not "duly appointed" trustees and that the Governor's written declarations purporting to confirm their positions were "void." The Board also sought, immediately and permanently, to enjoin Dunn and Paddock from "assuming or attempting to assume" positions on the Board.
On September 17, 1991, the trial court temporarily enjoined Paddock from attempting to assume a position on the Board, but temporarily enjoined the Board from interfering with Dunn's placement. The next day, the trial court issued an amended order to the same effect. On December 6, 1991, the trial court denied the defendants' motion to modify the temporary injunction against Paddock, and, from the denial of that motion, the defendants appealed (case number 1910469).
On November 5, 1991, the defendants counterclaimed, seeking a judgment declaring (1) that the Board violated its by-laws in its selection of Dr. Joe Reed and the Reverend James Smith to be chairman and vice-chairman of the Board, respectively, and, thus, that they did not validly hold those positions; (2) that the Board failed to apprise trustees of the proposed agenda at scheduled meetings with the punctuality and precision necessary to prepare the trustees for meaningful participation in the meeting; (3) that the Board violated the provisions of § 16-50-26 regulating the procedures for notifying trustees of pending meeting schedules; (4) that the Board's practice of holding "closed executive sessions and other meetings" violated the "Sunshine law"; and (5) that the Board violated its by-laws in failing to provide the defendants with minutes of Board and committee meetings, "notices, and explanatory materials and recommendations." *Page 522 
The defendants also sought an injunction requiring the Board to conform its practices to the declarations sought.
The claims and counterclaims were tried in bifurcated proceedings. At a trial that began on January 27, 1992, the trial court heard ore tenus evidence on the Board's claims, as well as those counterclaims alleging (1) that the Board had violated its by-laws in its selection of Dr. Reed and Reverend Smith, and (2) that the Board had violated its by-laws in failing to apprise trustees of the proposed agenda at scheduled meetings with the punctuality and precision necessary to prepare the trustees for meaningful participation.
On February 6, 1992, the trial court entered an order declaring (1) that the purported appointments of Dunn and Paddock were "void and of no force and effect," and, consequently, that neither Dunn nor Paddock was entitled to serve on the Board; and (2) that the Board did not violate its by-laws in its selection of the current chairman and vice-chairman of the board, and, consequently, that Dr. Reed and Reverend Smith were entitled to occupy those positions.[2] The defendants appeal from that order (case number 1910751).
The rest of the defendants' counterclaims were tried on evidence presented ore tenus during October, November, and December 1992. On January 5, 1993, the trial court entered a final judgment in favor of the Board on all remaining issues. The defendants appeal from that judgment (case number 1920953). The three cases were subsequently consolidated for appeal. For procedural reasons, we first address the issues presented in case number 1910751 — the appeal from the order entered on February 6, 1992.
 Case No. 1910751
A. The Claims Against Dunn and Paddock
The issue forming the basis of the Board's claims against Dunn and Paddock concerns the effect of the Committee's vote against their appointments, and the Committee's subsequent failure to report their appointments to the full senate for consideration. It is undisputed that the resolution of this issue turns on the proper construction of Ala. Code 1975, § 16-50-20(a), as well as § 16-50-25. Section 16-50-20(a) provides:
 "(a) [1] There is hereby created a board of trustees for Alabama State University, the state educational institution at Montgomery, Alabama. [2] The board of trustees shall consist of two members from the congressional district in which the institution is located and one member from each of the other congressional districts in the state as constituted on October 6, 1975, and who shall reside in that district, four members from the state at large who shall reside in different districts, and the governor, who shall be ex officio president of the board. [3] Except for a trustee at large, the position of any trustee shall be vacated at such time as he shall cease to reside in the district from which he was appointed. [4] The trustees shall be appointed by the governor, by and with the advice and consent of the senate, in such manner that the membership shall consist of at least a majority who are alumni and who have received a bachelor's degree from the said university; at least one-half of the board shall be from the prevailing minority population of the state according to the last or any succeeding federal census. [5] Trustees shall hold office for staggered terms of three, six, nine and 12 years with an equal number appointed to like terms, such period of terms designated by the appointing authority, with one-fourth to expire every three years, or until their successors are appointed. [6] All appointments shall be effective until adversely acted upon by the senate. [7] Provided, however, no trustee who is currently serving on the board or whose term has just expired, who has been previously confirmed by the senate, shall be required to be reconfirmed for the new term under this section, once appointed by the governor. [8] A member may be appointed *Page 523 
to serve a second term of 12 years, but no member shall be appointed to serve as trustee for more than a total of two terms. [9] The first members, however, shall be eligible to serve for two full additional terms in addition to their initial terms. [10] No trustee shall receive any pay or emolument other than his actual expenses incurred in the discharge of his duties as such. [11] No member of the governing board or employee or student of any public postsecondary education institution, no elected or appointed official having the power of review of the Alabama State University budget, other than the governor and no employee of the state of Alabama shall be eligible to serve on the board. [12] No member shall serve past September 30 following his seventieth birthday."
(Emphasis added.) For the convenience of the reader, we have numbered each sentence in this section.
Section 16-50-25 relates to the appointment of successor trustees at Alabama State University and provides:
 "Any vacancy in the office of trustee occurring during the recess of the legislature shall be filled by appointment of the governor from the same category in which the vacancy occurred. Such appointee shall hold office until the next session of the legislature, when the vacancy shall be filled by the governor by and with the consent of the senate. A trustee appointed to fill a vacancy by the governor, by and with the consent of the senate, shall hold office during the unexpired term."
(Emphasis added.)
The Board contends that the Governor's appointments of Dunn and Paddock could only, consistent with § 16-50-20(a), becomeeffective upon confirmation by an affirmative vote of the fullsenate. For this proposition, the Board relies on Sentence Four: "The trustees shall be appointed by the governor, by and with the advice and consent of the senate. . . ." The Board thus argues, in effect, that the adjournment sine die of the senate without a floor vote on the appointments of Dunn and Paddock constituted constructive rejection by the senate. Furthermore, the Board contends that the sole field of operation of § 16-50-25 is to provide the method whereby any
vacancy in the office of trustee occurring during the recess of the legislature shall be filled. It maintains that this section unequivocally provides that any appointment by the Governor in the recess of the legislature must be acted on by the Senate in the next session of the legislature; otherwise, it says, the appointment is void.
The defendants, however, contend that the appointments could only, consistent with § 16-50-20(a), be nullified by anegative vote of the full senate. Relying on Sentence Six, which states: "All appointments shall be effective until adversely acted upon by the senate," the defendants insist that the negative vote of the Committee and the Committee's subsequent failure to report the appointments to the full senate for consideration did not represent adverse senate
action, and, consequently, was ineffective to "remove" Dunn and Paddock from their positions on the Board. Thus, the defendants argue, in effect, that the adjournment sine die of the senate without a floor vote on the appointments of Dunn and Paddock constituted constructive consent by the senate.
The question presented by the senate's failure to vote on these appointments is one of first impression in this Court. In construing a statute, we are permitted, indeed required, to compare statutes addressing "related subject[s]."House v. Cullman County, 593 So.2d 69, 75 (Ala. 1992) (quoting 2A Sutherland Stat. Const., § 51.02 (4th ed.)). In doing so, we are not "arbitrarily to disregard the marked differences [and similarities] in terminology" found in such statutes. 593 So.2d, at 75.
Particularly relevant in this inquiry is a comparison of the statutes and constitutional provisions creating boards of trustees for other Alabama state colleges and universities. See Ala. Code 1975, § 16-47-30 (University of Alabama); Ala. Const. 1901, amend. 161 (Auburn University); § 16-49-20
(Alabama Agricultural and Mechanical University); § 16-51-3
(University of North Alabama); § 16-52-3 (Jacksonville State University); § 16-53-3 (Livingston University); § 16-54-2
(University of Montevallo); § 16-55-2 *Page 524 
(University of South Alabama); § 16-56-3 (Troy State University). That these sections vary considerably in terminology, and that the appointment provisions of § 16-50-20
differ markedly from the corresponding provisions in most of the other sections, is apparent from a cursory examination.
Alabama State University is a predominantly black institution. The only other predominantly black state-supported university is Alabama Agricultural and Mechanical University (Alabama A M) in Huntsville, Alabama. In 1975, the legislature created the board of trustees for that university. Act No. 198, § 1, 1975 Ala. Acts 683, codifiedat § 16-49-20, amended by Act No. 89-881, 1989 Ala. Acts 1778. The Act provided in § 1, in material part:
 "There is hereby created a Board of Trustees for Alabama Agricultural and Mechanical University, a state land-grant educational institution at Huntsville. . . . The trustees shall be appointed by the Governor, by and with the advice and consent of the Senate. . . . . All appointments shall be effective upon confirmation
by the Senate."
(Emphasis added.) The defendants admit that the clear terms of the legislation creating Alabama A M University's board of trustees provide that the trusteeship of those trustees vests only upon confirmation, that is, upon an affirmative vote
of the Senate. Therefore, adjournment sine die of the Senate without an affirmative floor vote on the appointments constitutes constructive rejection by the Senate. The Board agrees with this assessment and further contends that although the language in the legislation creating Alabama State University's trustees is somewhat different, the result intended was the same. In attempting to ascertain the meaning of the statute creating Alabama State University trustees, we find the comparison with the statute creating the trustees of a sister black institution to be of some interest.
There is a common thread running through the legislation creating the mechanism for appointing trustees of the various state-supported institutions. That thread is that the Governor shall make the appointments, but the appointments must be subject to the advice and consent of the Senate. Obviously, the Governor could not dictate how the Senate is to perform its statutory duty, nor can the Senate dictate to the Governor how he is to perform his. The Senate performs its responsibility by applying its own internal rules of procedure. Before 1951, appointments by the Governor to fill vacancies in trustee positions were submitted to the secretary of the Senate. There they would remain until that body called on the secretary to transmit the appointments to it for action. Beginning in 1951, such recess appointments were sent to the secretary of the Senate and the secretary then submitted them to the Committee on Rules and, recently, to the Committee on Confirmations.
After the Senate began referring nominations and appointments to a committee, it adopted Senate Rule 33, which prescribed the procedure for handling them. Senate Rule 33 provides:
 "All nominations and appointments shall be referred to, and be reported from the Committee on Confirmations before consideration by the entire Senate. If the Senate rejects a nomination or appointment, it will either forward its rejection to the Secretary of the Senate who shall forward the rejection to the appointing authority and request a new nominee be submitted, or, in the event that the pertinent statute permits, the Senate may select a substitute appointment."
Rules of the Senate of the State of Alabama 33 (1991) (emphasis added).
On September 9, 1991, roughly two months after the trustees in this case were voted on, the Senate passed a resolution that provided:
 "Whereas by constitutional and statutory mandates, the Senate is required to take action upon various nominations and appointments; and, whereas any action of appointment or nomination by any person, board, committee or any other legal entity that requires senate advice and consent and/or confirmation shall be done in compliance with the Senate Rule Thirty-three; and now therefore, be it resolved by the Senate of Alabama, that failure of the Committee on Confirmations to report a *Page 525 
nomination or appointment of any person shall be deemed a rejection by the Senate of such person."
Although this resolution was passed after the vote taken on the trustees involved in this litigation, this resolution purportedly put into writing the precedential procedures that had been followed by the Senate in its business for over 40 years. That is, once a nomination failed to get out of the proper committee, that nomination was dead. Furthermore, the attorney general of the State of Alabama, in an attorney general's opinion to Senator Charles D. Langford, August 14, 1991, page 4, opined that such nominations cannot be resubmitted to the Senate in any future legislative session.
Therefore, we hold that the action of the Committee on Confirmations rejecting the appointments of Dunn and Paddock was an adverse action of the Senate, which had the effect of divesting them of any authority to assume, or attempt to assume, positions of trustees on the Board of Trustees of Alabama State University.
The defendants have made much of the argument that this rationale allows a committee of the Senate to exercise authority that only the entire Senate can exercise under § 16-50-20(a), which provides that "all appointments shall be effective until adversely acted upon by the Senate." We see a difference between the rejection of a nominee and the approval of a nominee. In order to facilitate the dispatch of business by the Senate, committees were formed to provide certain essential functions. One of the functions of the Committee on Confirmations is to decide which nominees are worthy of consideration by the entire Senate. It is sound policy for the Senate to give the Committee full power to reject a nominee, but under Rule 33, the confirmation of a nominee must be by the full Senate; i.e., the committee cannot confirm a nominee. Rule 33 provides that "[a]ll nominations and appointments shall be referred to, and be reported from the Committee on Confirmations before consideration by the entire Senate. If the Senate rejects a nomination or appointment, it will either forward its rejection to the Secretary of the Senate . . ., or, in the event the pertinent statute permits, the Senate may select a substitute appointment." We hold that this Rule requires only that the Committee on Confirmations submit the names of the nominees it approves, not the names of the nominees it rejects.
Although we have discussed, in some detail, the defendants' arguments concerning the authority of the Senate's Committee on Confirmations to reject or divest the Governor's nominees, we have done so because of the extensive elaboration of this point in the brief of the defendants. However, the issue involved here, namely, the right of the trustee to hold office, has been clearly set forth in § 16-50-25. In other words, by virtue of this section, unless the Governor's appointee is confirmed by vote of the entire Senate in the next session of the legislature, the trustee's appointment is ended by force of law.
We further point out that our opinion concerning the vitality of the appointments of Dunn and Paddock is consistent with two attorney general's opinions, one to the Hon. Walter E. Penry, Jr., dated October 29, 1987, and the other to the Hon. Charles D. Langford, dated August 14, 1991, which concluded that "an appointment which must be submitted to the Senate expires upon the adjournment of that body if appropriate action has not been taken thereon." To conclude as the defendants in this case do, that the adverse action taken by the Committee on Confirmations was, indeed, a constructive consent, is to place an unnatural and strained construction on the word "consent," which flies in the face of reasonable statutory construction. Western World InsuranceCo. v. City of Tuscumbia, 612 So.2d 1159 (Ala. 1992); Sullivanv. State Farm Mutual Auto. Insurance Co., 513 So.2d 992 (Ala. 1987).
Therefore, the trial judge was correct in concluding that these nominees for trusteeship were divested of any interest or right to the positions which the Governor had sought to appoint them to when they failed to obtain the approval of the Committee on Confirmations.
B. The Counterclaims Against the Board
During the first trial in this bifurcated proceeding, the trial court considered the *Page 526 
counterclaims alleging (1) that the Board violated its by-laws in its selection of its chairman and vice-chairman, and (2) that the Board violated its by-laws in failing to punctually and precisely apprise trustees of the proposed agenda at scheduled meetings.
1. The Selection of the Chairman andVice-Chairman
The trial judge's disposition of this issue was based on the following factual findings and legal conclusions:
 "Defendants contend that trustees Joe L. Reed and Rev. James Smith have not been confirmed by the senate since their 1987 redesignation/reappointment caused by the 1986 amendment [to § 16-50-20]. The defendants argue this is in violation of Article I, Section 2, of the Bylaws, which states, 'The Chairman and Vice-Chairman shall serve two-year terms, may be reelected, but shall not serve beyond their term as members of the Board. A member who is appointed to the Board, but not confirmed for the specific term by the Senate, shall be ineligible to hold an office of the Board.'
 "The evidence shows that Chairman Reed and Rev. Smith were serving as trustees in 1986 when [§ 16-50-20] was amended, inter alia, to add Sentence [Seven], which states: 'Provided, however, no trustee who is currently serving on the Board or whose term has just expired or who has been previously confirmed by the Senate, shall be required to be reconfirmed for the new term under this section, once appointed by the Governor.' All trustees serving in 1986 had previously been confirmed by the Senate. All trustees now serving (except Ms. Coley) were reappointed by Governor Wallace to a redesignated term and did not require confirmation by the Senate under the provisions of Sentence [Seven]. The court interprets Sentence [Seven] as giving Senate approval to the reappointments of all trustees serving in 1986; or in the alternative, as waiving the necessity of further Senate confirmation of the reappointment of such trustees. In light of that interpretation of Sentence [Seven], Article I, Section 2, of the Bylaws does not affect the eligibility to office of persons who have been 'grandfathered' in their position by Sentence [Seven].[3]
 "The court finds that the Board bylaw restricting trustees who have not been confirmed from holding office has no application to these redesignated terms. To the extent that the bylaws conflict with a . . . statute, it is well known that the . . . statute controls.
 "The defendants also raised at trial the theory that the March 30, 1989, changes in the bylaws were illegally adopted because the November 1977 bylaws required amendments to the bylaws be adopted at 'regular meetings.' If the March 30, 1989, bylaws are voided, the November 1977 bylaws would prohibit the Chair[man] and Vice-Chair[man] from serving more than two (2) one-year terms. The March 30, 1989, meeting was a regular meeting because it was an adjourned meeting, rather than one called by the Governor as a special meeting. Although there is a conflict in the testimony on this point, the court finds that the Secretary of the Board gave more than ten days' notice of the substance of the changes to the bylaws to each trustee.
 Consequently, the court holds that trustees Joe L. Reed and Rev. James Smith have been lawfully elected chairman and vice-chairman, respectively."
As the trial judge observed, the defendants also contended that the Board had met at an illegal session to adopt its 1989 Bylaws, which repealed a section in the previous Bylaws that would have precluded the services of Dr. Reed and Reverend Smith as chairman and vice-chairman, respectively. Regarding this contention, the trial judge stated:
 "Section 16-50-26,[4] Code of Alabama 1975, sets out the method and manner of *Page 527 
both regular and special meetings of the Board. Special meetings are not at issue in the instant action. The statute sets regular meetings for the 'first Thursdays in May and November at the university unless the board shall, in regular session, determine to hold its meetings at some other time and place.'[5]
 "Defendants contend that the admitted practice of the Board to recess or adjourn at the 'call of the Chairman' is a violation of the statute. The court disagrees and finds that Section 16-50-26
gives the Board discretion in setting more meetings than the two (2) minimum meetings mandated in the statute. The only requirement is that the Board, 'in regular session, determine [to meet] at some other time and place.' The court finds that the Board, in its regular meetings, has consistently voted to recess or adjourn at the call of the Chairman. A majority of Board members have agreed to this practice, and it does not violate the statute which gives the Board members the right to meet as often as they desire, Section 16-50-26.
 "There are four (4) types of meetings of the ASU Board: (1) those on the dates established by statute (which are to be used if the Board has not otherwise provided); (2) those on dates established by the Board for recurrent meetings, such as a meeting on the Founders' Day Weekend; (3) those set ad hoc by the Board, such as 'adjourn to May 1,' . . . (4) meetings called by the Governor. The first three (3) types are 'regular meetings' because they are called by action of a majority of the Board, while the fourth is a 'special meeting' because it is called by a minority of the Board (the Governor or four members).
 "There is nothing in Section 16-5-26, Code of Ala. 1975, that forbids the Board from recessing or adjourning its meetings. The law applicable to corporations is that they may adjourn their meeting from a duly noticed board meeting to a later time if there is a quorum present to take the action of adjournment. See Oleck, Non-profit Corporations, Organizations, and Associations, 403 (3d ed. 1974). . . . Also, the court is aware that other public bodies, such as county commissions who are required by law to meet on certain days, quite often meet on the appointed day and adjourn their meetings to a time before the next statutory meeting date so as to be able to carry out business more efficiently. See, e.g., Dillard v. Crenshaw County, 748 F. Supp. 819, 827
n. 12 (M.D.Ala. 1990) (county commission approved settlement of lawsuit in adjourned meeting).
 "Based on the foregoing analysis, the court will enter a declaratory judgment that there is no prohibition on recessing or adjourning meetings, and the Board possesses the power to do so. The court denies the requested injunction."
We find no reason to reverse the trial court's judgment in case number 1910751 and we adopt the quoted portions of its order as part of the opinion of this Court.
 Case No. 1910469
The Board contends that the issues presented by the amended order entered on September 18, 1991, in which the trial court temporarily enjoined Paddock from attempting *Page 528 
to assume a position on the Board have been "superseded" by the permanent injunction to that effect entered on February 6, 1992. Consequently, the Board contends, the substantive questions presented in case number 1910469 — the appeal from the denial of the motion to modify the injunction issued in the amended order — are moot. We agree.
 "This Court will not decide questions that are moot or that have become purely academic. J.C. Jacobs Banking Co. v. Campbell, 406 So.2d 834 (Ala. 1981); City of Birmingham v. Long, 339 So.2d 1021 (Ala. 1976); Byrd v. Sorrells, 265 Ala. 589, 93 So.2d 146 (1957)." Smith v. Cook, 578 So.2d 1055, 1057 (Ala. 1991). "Neither will we set out to resolve an issue unless a proper resolution would afford a party some relief. City of Birmingham v. Southern Bell Telephone Telegraph Co., 234 Ala. 526, 176 So. 301 (1937); Caldwell v. Loveless, 17 Ala. App. 381, 85 So. 307 (1920)." 578 So.2d at 1057. Because the defendants have not demonstrated how a favorable decision in case number 1910469 would affect their substantive rights, the appeal in case number 1910469 is dismissed as moot.
 Case No. 1920953
The second trial in this bifurcated cause primarily concerned the counterclaim alleging that the Board often met in secret sessions in violation of the Alabama Sunshine Law, Ala. Code 1975, § 13A-14-2(a). In particular, the defendants contended that the Board may not, consistent with §13A-14-2(a), meet in "executive" sessions with its attorneys to discuss pending litigation.
The trial court held that an "executive session of the Board held on May 25, 1991, was protected by the attorney-client privilege and therefore was not unlawful."[6] The defendants contend that this holding is inconsistent with § 13A-14-2(a), and they urge us to adopt the following rule:
 "That the Board may not meet in executive or secret session with its attorneys and may not discuss with its attorneys any item or thing, including pending or contemplated litigation, in executive session. That is, if the Board members themselves may not meet in executive session to discuss an issue or thing, then the Board may not circumvent the prohibition by meeting in executive session with the Board's attorneys to discuss what might otherwise be regarded as attorney-client confidential matters."
Brief of Appellants, at 65.
Section 13A-14-2(a) provides:
 "(a) No executive or secret session shall be held by any of the following named boards, commissions or courts of Alabama, namely: Alabama public service commission; school commissions of Alabama; board of adjustment; state or county tax commissions; any county commission, any city commission or municipal council; or any other body, board or commission in the state charged with the duty of disbursing any funds belonging to the state, county or municipality, or board, body or commission to which is delegated any legislative or judicial function; except, that executive or secret sessions may be held by any of the above named boards or commissions when the character or good name of a woman or man is involved."
The defendants contend that this section, which excepts from its application only sessions at which the discussion is addressed to the "character or good name of a woman or man," controls sessions involving matters that would otherwise be protected by the attorney-client privilege. We disagree with this contention.
The privilege of confidentiality represents one of the cornerstones of the attorney-client relationship. Rule 1.6(a), Ala.R.Prof. Conduct, provides: "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b)." The comment to Rule 1.6 makes the following pertinent observations: *Page 529 
 "A lawyer, as an officer of the court and as a part of the judicial system, is charged with upholding the law. One of the lawyer's functions is to advise clients so that they avoid any violation of the law in the proper exercise of their rights.
 "The observance of the ethical obligation of a lawyer to hold inviolate confidential information of the client not only facilitates the full development of facts essential to proper representation of the client but also encourages people to seek early legal assistance.
 "Almost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws and regulations, deemed to be legal and correct. The common law recognizes that the clients's confidences must be protected from disclosure.
Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld.
 "A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. The client is thereby encouraged to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter."
(Emphasis added.) See also Ala. Code 1975, § 12-21-161
(codifying the attorney-client confidentiality privilege).
Matters bearing as directly on the attorney-client relationship as the privilege of confidentiality does are inherently subject to judicial oversight and control.
 "We said in Jones v. Alabama State Bar, 353 So.2d 508, 509 (Ala. 1977), quoting from In re Evans, 42 Utah 282, 130 P. 217 (1913):
 "The summary jurisdiction which the court has over its attorneys as officers of the court is also invoked. That jurisdiction is inherent, continuing, and plenary, and exists independently of statute or rules of equity, and ought to be assumed and exercised as the exigencies and necessity of the case require, not only to maintain and protect the integrity and dignity of the court, to secure obedience to its rules and process, and to rebuke interference with the conduct of its business, but also to control and protect its officers, including attorneys."
Ex parte Taylor Coal Co., 401 So.2d 1, 3 (Ala. 1981).
This "inherent, continuing, and plenary" control cannot, consistent with the Alabama Constitution, be abridged by legislative action. See Ala. Const. 1901, § 43: "In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them . . . to the end that it may be a government of laws and not of men." Thus, in Alabama, as elsewhere, "[t]he Legislature . . . is without authority to enact laws which impair the attorney's ability to fulfill his ethical duties as an officer of the Court." Smith CountyEducation Ass'n v. Anderson, 676 S.W.2d 328, 334 (Tenn. 1984); see also Minneapolis Star Tribune Co. v. Housing Redevelopment Authority, 246 N.W.2d 448 (Minn. 1976); accord,Tahoe Regional Planning Agency v. McKay, 769 F.2d 534 (9th Cir. 1985); Oklahoma Ass'n of Mun. Attorneys v. State,577 P.2d 1310 (Okla. 1978). But see Neu v. Miami Herald Publishing Co.,462 So.2d 821 (Fla. 1985).
Although we must reject the defendants' proposed rule, we also recognize the potential for abuse of the privilege that a broad application of the exception would invite. As the Supreme Court of Tennessee pointed out: "A public body could meet with its attorney for the ostensible purpose of discussing pending litigation and instead conduct public business in violation of the Act." Smith County EducationAss'n, 676 S.W.2d, at 335. To prevent such abuse, that court set forth the following restrictions on the scope of the exception to Tennessee's "Open Meetings Act":
 "The exception is limited to meetings in which discussion of present and pending litigation takes place. Clients may provide counsel with facts and information regarding the lawsuit and counsel may advise them about the legal ramifications of those *Page 530 
facts and the information given to him. However, once any discussion, whatsoever, begins among the members of the public body regarding what action to take based upon advice from counsel, whether it be settlement or otherwise, such discussion shall be open to the public and failure to do so shall constitute a clear violation of the Open Meetings Act.
". . . .
 "In summary, we hold that discussions between a public body and its attorney concerning pending litigation are not subject to the Open Meetings Act. We emphasize that this is a narrow exception
and applies only to those situations in which the public body is a named party in the lawsuit."
Id. at 334-35 (emphasis added). We agree with this standard and adopt it as the rule in Alabama.
The judgment in case number 1920953 is affirmed.
AFFIRMED.
1910469 — DISMISSED AS MOOT.
1910751 — AFFIRMED.
1920953 — AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] While this appeal was pending, Guy Hunt was succeeded by Jim Folsom, Jr., who has been substituted in this appeal. See Rule 43(b), Ala.R.App.P.
[2] The trial court also found that the Board sometimes violated its by-laws in failing to punctually provide notice of the times of meetings and the proposed agenda, accompanied by "explanatory materials and recommendations," and it enjoined the Board from further violations in that regard.
[3] This "grandfather" provision was inapplicable to the terms to which Dunn and Paddock were appointed in 1991.
[4] Section 16-50-26 provides:
 "The first meeting of the board of trustees of Alabama State University after all members have been appointed shall be upon the call of the governor. The board shall hold regular meetings on the first Thursdays in May and November at the university unless the board shall, in regular session, determine to hold its meetings at some other time and place. The regular May meeting shall be the regular annual meeting. Special meetings of the board may be assembled by either one of the two methods outlined as follows:
 "(1) Special meetings of the board may be called by the governor. In calling such special meetings the governor shall mail a written notice to each trustee, naming the time and place thereof, at least 10 days in advance of the date of such meetings.
 "(2) Upon the application in writing of any four members of the board, the governor shall call a special meeting, naming the time and place thereof and causing notices to be issued in writing to the several members of the board. Such meetings shall not be held on a date less than 10 days subsequent to the notices from the governor."
[5] The March 30, 1989, meeting, during which the bylaws were amended, was convened from a meeting held on December 21, 1988. The December meeting had been convened from the recess of the regular November meeting.
[6] It is undisputed that the Board met in sessions from which the public was excluded to discuss certain matters in the presence of its attorneys.